UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DARCIE JEAN STICKLER,<br><br>             Plaintiff,<br><br>     vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner, Social Security<br>Administration,<br><br>             Defendant. | CIV. 14-5087-JLV<br><br>ORDER |

**INTRODUCTION**

Plaintiff Darcie Stickler filed a complaint appealing from an administrative law judge's ("ALJ") decision denying disability insurance benefits.   (Docket 1).   Defendant denies plaintiff is entitled to benefits.   (Docket 5).   The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF").   (Docket 7).   The parties filed their JSMF.   (Docket 11).   For the reasons stated below, plaintiff's motion[1] to reverse the decision of the Commissioner (Docket 12) is granted.

---

[1]Plaintiff's motion seeks summary judgment pursuant to Fed. R. Civ. P. 56(a).   (Docket 12).   The text of the motion more traditionally comports with the court's briefing schedule which directed plaintiff to "serve and file a Motion for Order Reversing Decision of the Commissioner . . . and a supporting memorandum."   (Docket 7 ¶ 2).   The court will consider plaintiff's motion in this context.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 7) is incorporated by reference.   Further recitation of salient facts is incorporated in the discussion section of this order.

On May 31, 2011, Ms. Stickler filed an application for disability insurance ("DI") benefits under Title II.   (Docket 11 p. 1 ¶ 1).   On September 28, 2011, Ms. Stickler filed an application for supplemental social security income ("SSI") benefits under Title XVI.   Id.   Both applications alleged an onset of disability date of September 28, 2011.   Id. pp. 1 ¶ 2.   On July 26, 2013, the ALJ issued a decision finding Ms. Stickler was not disabled.   Id. pp. 1-2 ¶ 2; see also Administrative Record at pp. 10-25 (hereinafter "AR at p. ____").   On September 25, 2014, the Appeals Council denied Ms. Stickler's request for review and affirmed the ALJ's decision.   (AR at pp. 1-4).   The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration.   It is from this decision which Ms. Stickler timely appeals.

The issue before the court is whether the ALJ's decision of July 26, 2013, that Ms. Stickler was not "under a disability, as defined in the Social Security Act, since September 28, 2011, [through July 23, 2013]" is supported by substantial evidence in the record as a whole.   (AR at p. 24) (bold omitted); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); <u>Choate v. Barnhart</u>, 457 F.3d 865, 869 (8th Cir. 2006); <u>Howard</u>, 255 F.3d at 580.   The court reviews the Commissioner's decision to determine if an error of law was committed.   <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992).   "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."   <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."   <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005) (quoting <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence.   <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).   A

3

reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.   See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DI benefits under Title II or SSI benefits under Title XVI.   20 CFR §§ 404.1520(a) and 416.920(a).[2]   If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.   Id.   The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

---

[2]The criteria under 20 CFR § 416.920 are the same under 20 CFR § 404.1520.   Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992).   All further references will be to the regulations governing DI benefits, unless otherwise specifically indicated.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).   The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.   (AR at pp. 14-15).

**STEP ONE**

At step one, the ALJ determined Ms. Stickler had been engaged "in substantial gainful activities from January 5, 2012 through October 3, 2012." Id. at p. 15.   As a result of this activity the ALJ concluded Ms. Stickler "cannot be found disabled during the time she performed this work."   Id. at p. 16 (referencing 20 CFR § 404.1520(b)).   The ALJ then found Ms. Stickler had not been engaged in substantial gainful activity since October 5, 2012.   Id.

**STEP TWO**

"At the second step, [the agency] consider[s] the medical severity of your impairment(s)."   20 CFR § 404.1520(a)(4)(ii).   "It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).   A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities.   20 CFR § 404.1521.   An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   Kirby, 500 F.3d at 707.   "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step

5

two." Id. (citation omitted).   Additionally, the impairment must have lasted at least twelve months or be expected to result in death.   See 20 CFR § 404.1509.

The ALJ found Ms. Stickler suffered from the following severe impairments: "back disorder, learning disability, mood disorder not otherwise specified versus a depressive disorder not otherwise specified, anxiety disorder[3] not otherwise specified versus generalized anxiety disorder."   (AR at p. 16) (bold omitted).

**STEP THREE**

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525, and 404.1526.   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled.   A claimant has the burden of proving an impairment or combination of impairments meet or equals a listing within Appendix 1.   Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement

_____

[3]Anxiety disorder is a chronic condition characterized by an excessive and persistent sense of apprehension with physical symptoms such as sweating, palpitations, and feelings of stress.   It included agoraphobia and panic disorders.   MedicineNet.com.

of 20 CFR § 404.1509, claimant is considered disabled.   If not covered by these criteria, the analysis is not over, and the ALJ proceeds to the next step.

At step three, the ALJ found Ms. Stickler's severe impairments did not qualify either individually or collectively to meet or equal a listing under Listings 12.02, 12.04 or 12.06.   (AR at p. 17).   Ms. Stickler challenges this finding as it relates to Listing 12.04.   (Docket 13 at pp. 7-10).   She argues "[i]t was an error of law for the ALJ to not give deference to Dr. Lord, a long time treating physician and to not find Darcie eligible for Social Security disability benefits."   Id. at p. 10.

The qualifications for Listing 12.04 are as follows:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia[4] or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or

---

[4]"Anhedonia" is a "[l]ack of pleasure in acts that are normally pleasurable. May be an early sign of schizophrenia."   (Docket 11 at p. 2 ¶ 2).

  f. Feelings of guilt or worthlessness; or
  g. Difficulty concentrating or thinking; or
  h. Thoughts of suicide; or
  i. Hallucinations, delusions or paranoid thinking; or

 2. Manic syndrome characterized by at least three of the following:

  a. Hyperactivity; or
  b. Pressure of speech; or
  c. Flight of ideas; or
  d. Inflated self-esteem; or
  e. Decreased need for sleep; or
  f. Easy distractibility; or
  g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
  h. Hallucinations, delusions or paranoid thinking;

Or

 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

 1. Marked restriction of activities of daily living; or
 2. Marked difficulties in maintaining social functioning; or
 3. Marked difficulties in maintaining concentration, persistence, or pace; or
 4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

(20 CFR § 404, Subp. P. App. 1 § 12.04).   The ALJ must assess paragraph B before applying the paragraph C criteria.   Id. at § 12.00(A).   Paragraph C criteria are assessed "only if . . . paragraph B criteria are not satisfied."   Id.

An ALJ is instructed to find a claimant has "a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."   Id.   "The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity.   The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A."   Id.

The ALJ must "measure severity according to the functional limitations imposed by your medically determinable mental impairment(s)."   Id. at § 12.00(C).   The ALJ is directed to "assess functional limitations using the four criteria in paragraph B of the listings . . . ."   Id.   "A marked limitation may arise when several activities or functions are impaired, or even when only one is

9

impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Id.

For purposes of paragraph B, the regulations "do not define 'marked' by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function." Id. at § 12.00(C)(1). Similarly, for social functioning in subsection 2 of paragraph B, the regulations "do not define 'marked' by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function." Id. at § 12.00(C)(2). In considering subsection 3 of paragraph B, the regulations "do not define 'marked' by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. . . . [I]f you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions." Id. at § 12.00(C)(3). When evaluating "episodes of decompensation" under subsection 4 of paragraph B those "may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." Id. at § 12.00(C)(4). "Episodes of

decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode."   Id.   "The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.   If [the claimant has] experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, [the ALJ] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence."   Id. (emphasis removed).

Documentation for evaluation under this subsection includes "evidence from an acceptable medical source . . . [i]nformation from the individual . . . . other professional health care providers . . . . [and] nonmedical sources, such as family members.   Id. at § 12.00(D)(1)(a)-(c).   "[I]n cases involving agoraphobia[5] and other phobic disorders, panic disorders, and posttraumatic stress disorders, documentation of the anxiety reaction is essential."   Id. at § 12.00(D)(11).   "At least one detailed description of [the claimant's] typical reaction is required. The description should include the nature, frequency, and duration of any panic

---

[5]"Agoraphobia" consists of "[o]verwhelming symptoms of anxiety, often leading to a panic attack."   (Docket 11 at p. 2 ¶ 1).

attacks or other reactions, the precipitating and exacerbating factors, and the functional effects."   Id.

"Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure.   Highly structured and supportive settings may also be found in your home.   Such settings may greatly reduce the mental demands placed on you."   Id. at § 12.00(F).   "If your symptomatology is controlled or attenuated by psychosocial factors, [the ALJ] must consider your ability to function outside of such highly structured settings."   Id.

"In cases where overt symptomatology is attenuated by the use of [medications], particular attention must be focused on the functional limitations that may persist.   [The ALJ] will consider these functional limitations in assessing the severity of your impairment."   Id. at § 12.00(G).

In arriving at the conclusion that Ms. Stickler's impairments did not individually or collectively meet or equal a listing under Appendix 1, the ALJ found:

> First, State Agency physicians and examiners concluded that the claimant's impairments did not meet or equal a Medical Listing. . . . Second, no consultative examiner has concluded that a Medical Listing is met or equaled.   Third, the psychological medical expert did not conclude that a Medical Listing was met or equaled. Fourth, no treating or examining physician has suggested that the

claimant's impairments meet or equal a Medical Listing.[6]   Finally, based upon the undersigned's independent review, no Medical Listing is met or equaled.

(AR at p. 17) (referencing Social Security Ruling 96-6p).

The ALJ discussed Ms. Stickler's limitations under the paragraph B criteria:

> In activities of daily living, the claimant has mild restriction. The claimant is able to independently care for her personal hygiene, she can cook meals, do household chores, drive a car, go shopping, and plays on the computer . . . . (referencing AR at pp. 269-276).

> In social functioning, the claimant has mild difficulties.  She spends time with her husband and friends, going to Wal-Mart and talking on the phone . . . . She is able to maintain a long term relationship and is socially interactive . . . . (referencing AR at pp. 269-276 and 425-442).

> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  She has a history of a learning disorder but mental status examinations reveal that she is within normal limits and she herself reported that she can perform 2 to 3 step instructions . . . . (referencing AR at pp. 398-409).

> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration . . . .

> Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

_____

[6]The opinion report of Ms. Stickler's treating psychiatrist, Dr. Charles Lord, provided answers to every section of the paragraph B criteria.  See AR at pp. 313-15, 324-25, 513-15, 566 & 568.   If given controlling weight, Dr. Lord's opinion would support a finding that Ms. Stickler qualifies under Listing 12.04. 20 CRF § 404.1527(d)(2).

Id. at p. 17.   While not specifically mentioned to arrive at these factual

determinations, the ALJ chose to give little, if any, weight to Ms. Stickler's

mother's testimony; less weight to Ms. Stickler's testimony and the opinions of

her treating psychiatrist, Dr. Lord; greater weight to the opinion of the state

agency consultant, Dr. Whittle; and persuasive weight to the opinion of Dr. Pelc,

a consultant psychologist, who testified at the hearing.   (AR at pp. 19, 21 & 22).

It is necessary to determine whether the ALJ's decision was supported by

the substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate v.

Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.

### MS. SHARPE

The ALJ chose to give little, if any, weight to the testimony of Ms. Sharpe,

plaintiff's mother, because she "has a financial stake in this claim as the

claimant lives with her and the record as a whole does not support [the] severe

limitations [the mother identifies]."   (AR at p. 19).   The court notes that family

members "always have a stake in the claim" because it is their child, spouse or

other family member who is seeking Social Security benefits.   If this relationship

was a valid basis for rejecting the testimony of a family member, the regulations

would specifically direct an ALJ to disregard the statements and observations of

these individuals.   To the contrary, the regulations encourage an ALJ to seek

the testimony of family members because they have the most frequent contact

and exposure to the claimant's physical and mental impairments.   Appendix 1

14

§ 12.00(D)(1)(c).   The fact that Ms. Stickler and her husband lived with Ms. Sharpe for several months is not a valid reason to discount her testimony.

Turning to the substance of Ms. Sharpe's July 2013 testimony, the ALJ summarized her testimony as "she has observed that the claimant is unable to get out of bed two times a week and that her functional abilities are restricted in that she cannot sit for more than 15 minutes or walk for 2 blocks . . . ."   (AR at p. 19).   This summary is an inaccurate recitation of her actual testimony.   Ms. Sharpe testified:

[Darcie] walks crooked and slow, and has difficulty sitting up. (AR at p. 317 ¶ 2);

[She] can tell that Darcie is in pain by her eyes and by her disposition because she gets bitter and angry when she is in pain. Id. at pp. 317-18 ¶ 3;

[She] helps Darcie . . . get out of bed approximately two times per week because she cannot get up due to her pain or her not being able to move well enough to get up. . . [and Ms. Sharpe] has observed [Darcie's husband] help Darcie get out of bed.   Id. at p. 318 ¶ 4;

[Ms. Sharpe, Darcie's husband and others] help Darcie get out of a lawn chair.   Id.;

[She] has observed that Darcie['s] . . . ability to stand is not good . . . if Darcie stands for too long, afterwards she will sit or lay down.   Id. at pp. 318-19 ¶ 6;

Darcie . . . sits . . . for about 15 minutes and then has to move around or lay down.   Id. at p. 319 ¶ 7;

Darcie walk[s] for two blocks and afterward goes to bed.   Id. ¶ 8;

After Darcie . . . bends over she cannot get back up and [Darcie's husband] or I have to help her up.   Id. ¶ 9;

Darcie's energy level depends on her pain level.   Id. ¶ 10;

15

Darcie stand[s] to wash dishes but cannot complete doing them because it hurts her back.   Id. ¶ 11;

[When] Darcie . . . tr[ies] to dust and if she bends to do so, she . . . will not be able to complete all the dusting.   Id. at p. 320 ¶ 12;

Darcie . . . uses an electric cart to shop and . . . she will not shop in a store if the store does not have an electric cart.   Id. at ¶ 14;

[S]ome days Darcie is sad and cries a lot and [we] help her get through it.   Id. ¶ 15;

Darcie . . . does not leave the residence that much and when she does leave someone is always with her because she said she is afraid something might happen to her.   Id. ¶ 16; and

Darcie['s] . . . quality of life is poor because she does not do much for activities and has to rely on me or others for a lot of things like shopping, helping her out of her bed, and cleaning the bathtub.   Id. at p. 321 ¶ 17.

The ALJ improperly discounted Ms. Sharpe's testimony solely on the ALJ's assertion that she had a financial stake in her daughter's claim.   Appendix 1 § 12.00(D)(1)(c).   Ms. Sharpe's testimony is consistent with Dr. Lord's report that Ms. Stickler "does list some and has a difficult time getting up and down out of the chair today.   She uses her arms to push herself up, rather than using her legs, and sits in an unusual posture, leaning back to her right and slouching down some in the chair."   (AR at p. 403).   Both Ms. Sharpe's and Dr. Lord's observations are consistent with the observation on March 8, 2012, of Dr. Ertz: "[m]otor impairment was noted due to chronic back pain.   She walk[s] with an uneven gait."[7]   (AR at p. 400).

---

[7]Dr. Ertz saw Ms. Stickler one time as a consulting psychologist for the South Dakota Office of Disability Determination Services.   (AR at p. 398).   It does not appear Dr. Ertz had access to any of Dr. Lord's psychiatric records and he certainly had no access to Dr. Lord's records after March 8, 2012.

16

The ALJ declared that the "later records do not support a worsening of symptoms" and adopted the opinions of the State Agency consultants and Dr. Pelc concerning Ms. Stickler's functional levels.   (AR at p. 20).   The State Agency consultants, as well as Dr. Pelc, relied on the time period during which Ms. Stickler was "precluded from receiving benefits."   Id.   While this was after the September 2011 back surgery, it was before Ms. Stickler's physical and mental conditions deteriorated.

Ms. Sharpe clarified that her daughter just did not get out of bed several times a week, but rather, either her mother or husband had to physically assist Ms. Stickler with the process.   Ms. Sharpe's observations of her daughter's physical abilities is telling in that Ms. Stickler attempts to accomplish household tasks at her own slow pace, only shops in stores with electric carts and when she does walk for even 15 minutes she must sit down to rest or go to bed.

"The failure [of the ALJ] to consider [Ms. Sharpe's testimony] and the misstatement of the record . . . demonstrates a failure to properly analyze the effects of a structured setting as required by the regulations."   Nowling v. Colvin, ___ F.3d ___, No. 14-2170, 2016 WL 690821 at *8 (8th Cir. Feb. 22, 2016) (referencing Appendix 1 § 1200(F)).   "Simply put, the nature of the medical condition and the nature of the life activities, including such considerations as independence, should be considered against the backdrop of whether such activities actually speak to claimant's ability to hold a job.   Participation in

17

activities with family or activities at home and at 'your own pace' may not reflect an ability to perform at work."   Id.

The ALJ did not include any reference to Ms. Sharpe's 2013 observations of her daughter's pain or the manner in which the pain affected her daily activities.   This is not a fair consideration of the record.   Ms. Sharpe's "testimony serves as a third-party's observation of the symptoms the ALJ appears to have rejected as non-credible subjective complaints."   Id., 2016 WL 690821 at *9.

The ALJ's conclusion to give Ms. Sharpe's testimony little or no weight is not supported by substantial evidence and the ALJ did not provide good reasons for discounting the testimony.   "[F]ailure to consider [Ms. Sharpe's] testimony was contrary to the governing regulations."   Id., 2016 WL 690821 at *7 (referencing Appendix 1 § 1200(D)(1)(c)).

DR. LORD

Dr. Lord began counseling Ms. Stickler when she was six years old.[8] (Docket 11 at p. 5 ¶ 10).   Dr. Lord supervised a master's level clinician who treated Ms. Stickler for a couple of years.   (AR at p. 513).   After that, Ms. Stickler continued care with her pediatrician who treated her with antidepressants for a number of years.   Id.   Dr. Lord reported Ms. Stickler returned in 2000 at age 27 for medication supervision.   (AR at p. 513).   He

_____

[8]The Commissioner argues this statement "is a reach."   (Docket 14 at p. 7).   The statement is not "a reach" as the joint statement of material facts acknowledges Dr. Lord's treatment of Ms. Stickler began when she was six years old.   (Docket 11 at p. 5 ¶ 10).

18

noted "[h]er diagnostic impression at that time was major depression, recurrent and chronic, mildly severe, non-psychotic; rule out bipolar disorder with co-morbid generalized anxiety disorder." Id. He also noted "[s]he retained her pervasive developmental disorder from childhood." Id. At that time, Ms. Stickler was having "trouble functioning because of her persistent symptoms of depression and anxiety, as well as her limitations related to developmental issues." Id. Dr. Lord treated her for some period of time with antidepressants. Id. at p. 514. She re-contacted Dr. Lord in 2012 when "[s]he again presented with severe anhedonia, dysphoria, mood swings, and recurrent symptoms of depression and anxiety." Id. As this was after her 2011 back surgery, Dr. Lord noted "she was cut back at work because of the ongoing pain and her difficulties functioning there." Id.

In 2012, Ms. Stickler reported having difficulty continuing her work as a certified nursing assistant at a nursing home, so she was moved to a part-time position at night as her employer did not want to lose her as an employee. (AR at p. 403). Dr. Lord's mental examination noted Ms. Stickler was "oriented to person, place, and time. Recent and remote memory are intact. . . . She is able to do simple calculations but has difficulty with more complex issues, such as subtracting seven from one hundred. She has difficulty typing, texting, and using computers. She has difficulty with higher abstractive concepts but can do some similarities and simple proverbs . . . . She has significant anxiety. . .

[and] her symptoms seem to be more intense at different times but it may be also reactive to environmental stressors." Id. at p. 405.

Dr. Lord charted her "AXIS IV" as "[m]oderate to severe" and her Global Assessment of Functioning ("GAF") at "50 to 51."[9]   Id. at p. 406.   Her GAF remained in the "50 to 53" range for several visits.[10]   Id. at pp. 406-09 & 488-89. Historically, all of Ms. Stickler's GAFs remained in the 50 to 55 range during 2000-2004.   Id. at pp. 490-511.

Dr. Lord noted the impact of Ms. Stickler's unresolved back pain on her functioning.   "Darcie's ability to maintain social functioning has deteriorated . . . . She now has a marked to extreme limitation due to the . . . combination of factors [developmental issues, depression, mood disorder and back injury]." (AR at p. 514).   "The chronic pain . . . undermines her ability to concentrate,

_____

[9]GAF is a numeric rating, on a scale of 0 to 100, used to rate subjectively an individual's "overall level of functioning" by rating symptom severity and social, occupational, or psychological functioning.   See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, "Axis V: Global Assessment of Functioning" at Axis V: Global Assessment of Functioning" at *34 (DSM-IV-TR 2000).   Where the symptom severity and level of functioning are discordant, the GAF rating reflects the worst of the two.   Id.   GAF ratings represent current levels of functioning "because ratings of current functioning will generally reflect the need for treatment or care."   Id.   "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . . [and a] GAF of 51 to 60 indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . .'"   Nowling, 2016 WL 690821 at n.3 (internal citations omitted).

[10]Dr. Ertz assigned Ms. Stickler a GAF of 50 during his single consultation with her on March 8, 2012.   (AR at p. 402).   His diagnosis was "[d]epressive disorder, NOS" and "[a]nxiety disorder, NOS."   Id. at p. 401.

persist, and to pace to a marked/extreme basis . . . . Her anxiety, depression, and related symptoms persist.   She intermittently has panic attacks and her anxiety becomes unbearable."   Id. at pp 514-15.   Without identifying the specific events, Dr. Lord reported Ms. Stickler had four or more severe depressive episodes "and she had sought treatment from age 16 forward for the reoccurrences."   Id. at p. 514.   Dr. Lord noted Ms. Stickler "has never been a malinger and if anything, she has worked in pain in an attempt to not be overly dependent upon anyone else or on the system."[11]   Id. at p. 515.   Dr. Lord reported "[s]he would be absent from work . . . for greater than four days per month."   Id. at p. 568.   In arriving at this conclusion Dr. Lord considered her "chronic pain and severe physical impairment," "chronic depression and anxiety aggravated by her physical debilitation," "her pain medications," and "[f]rom a psychiatric perspective, she still has anxiety, crying spells, depression, insomnia, and mood lability."   Id.

The Commissioner argues Dr. Lord should not be considered a treating physician because he saw Ms. Stickler only three times in 2012.   (Docket 14 at p. 7) (citing AR at pp. 403, 405 & 488-89).   This is a misstatement of the record. In 2012, Dr. Lord saw Ms. Stickler on May 16, May 30, June 13, June 27, and July 25.   (AR at pp. 403-09 & 488).   While he had not seen her since 2004, Dr. Lord saw her twenty times in 2000-2004.   (AR at pp. 490-2, 494-97, 499-511).

---

[11]Ms. Stickler previously received disability benefits from July 1, 1990, through June 2009.   (Docket 11 at p. 3 ¶ 1).   Those benefits were discontinued when she gained employment.

Dr. Lord's 2012 clinical records disclose Ms. Stickler's condition had not improved since 2000-2004 but had deteriorated significantly and he adjusted her medications accordingly.

The Social Security Administration considers GAF of limited importance and declines to endorse its use as correlating "to the severity requirements of the mental disorder listings." Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010) (internal quotation marks and citation omitted). See 65 Fed. Reg. 50746, 50764–65 ("[GAF scores] do[] not have a direct correlation to the severity requirements in our mental disorders listings."); see also Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010).

Notwithstanding this limitation, when confronted with multiple GAFs over an extended time period the ALJ should consider these findings in evaluating the Dr. Lord's credibility. Jones, 619 F.3d at 974 n.4; see also Lawson v. Colvin, 807 F.3d 962, 965 n.3 (8th Cir. 2015) (GAF scores must be considered in light of the other testimony in the record).

MS. STICKLER

While in school, Ms. Stickler was in special education with an individualized education program ("IEP"). (AR at pp. 548-64). The 1990 IEP reported she was "functioning at approximately 4.5 grade level for math and approximately 6.0 grade level for reading." (AR at p. 549; see also Docket 11 ¶ 9). That same IEP noted her "[d]eficits . . . in word knowledge and abstract thinking skills. Math is weak in multiplication, division and word problems. . . .

22

She's an extremely well-mannered, hard-working, mature, cooperative and responsible young lady that doesn't allow anything to stop her.   Good verbal and vocational skills.   Low memory skills."   (AR at p. 549; <u>see</u> <u>also</u> Docket 11 ¶ 9). Ms. Stickler remained in special education through high school graduation. (Docket 11 ¶ 9).

For purposes of step three, the ALJ adopted Ms. Stickler's 2011 disability report.   (AR at p. 17) (referencing AR at pp. 269-276).   This disability report was completed just two months after her back surgery.   She reported being able to housework, laundry, drive, cook, vacuum, shop, watch television and take care of herself.   (Docket 11 at p. 3 ¶ 3).   She reported using a computer for one hour a day.   (AR at p. 273).

But what the ALJ did not consider is that in a subsequent disability report of May 2012 Ms. Stickler did not know how to operate a computer for work purposes.   She reported she "can't do computer work (can turn the computer on and go to a game like Solitaire, but doesn't [sic] know how to [do] any programs)."[12]   (AR at p. 280).   She also reported that she no longer socialized "due to d[e]pression, anxiety and pain. . . . Housekeeping is just done as tolerated by pain and depression . . . many things are just left undone.   Doesn't finish what she starts."   <u>Id.</u>

---

[12]It is disingenuous for the Commissioner to cite the same 2011 report in support of the ALJ's analysis while ignoring the detailed explanation in the May 2012 report.   (Docket 14 at p. 8 n.4).

In a September 2012 disability report, Ms. Stickler reported:

I cannot lift without being in sever [sic] pain.  I have problems
walking, standing, bending, and stretching.  I cannot sleep well at
all.  I cannot get out of bed on my own at times.  I am no longer
able to shop on my own.  Simple tasks that only took me minutes
before now take an hour to do or I have to have others help me.  I
am not able to clean, vacuum, make beds without being in sever [sic]
pain.  It is better if someone to do it [sic] for me otherwise I am
crippled up for several days.  My depression has me isolated from
my family and friends.  I do not socialize like I did before because of
my pain.  When I get in and out of the car I experience pain.  If I am
traveling very long I have to get out, but still feel the pain.

(AR at p. 293).

Ms. Stickler testified at the July 8, 2013, administrative hearing.  (AR at
pp. 42-66).  She testified her learning disabilities, back and chronic pain were
her disabling impairments.  Id. at p. 45.  Once prompted by the ALJ and her
attorney, Ms. Stickler testified she had "anxiety problems," "depression," "panic
attacks" and "just lot[s] of emotional problems because I can't work."  Id. at p.
46.  Her testimony articulated the same problems discussed above.  Id. at p.
47.  She had injections in her back for pain and was in the pain management
program at the Rapid City Regional Hospital for chronic pain.  Id. at p. 48.  The
steroid injections were discontinued because they were not helpful.  Id. at p. 49.

For pain, Ms. Stickler takes 50 milligrams of Tramadol three or four time a
day.  Id.  She also takes Gabapentin and one-half tablet of Valium in the
morning and the other half at bedtime.  Id.  Twelve hour medicated patches are
used for pain but do not provide much relief.  Id.  Ms. Stickler uses bed rest to
alleviate the pain.  Id. at p. 50.  On "good days" she is able to get out of bed, do

24

something, walk for up to an hour, and then is "right back in . . . bed again."   Id.
On "bad days" she is in "constant pain" and remains in bed all day.   Id.

    For depression, Ms. Stickler takes Prozac prescribed by Dr. Lord.   Id. at p.
52.   She testified to now having more bad days than good days because of her
depression.   Id.   She testified being in stores around people is very difficult as
she becomes distracted and unable to concentrate.   Id. at p. 53.   When in a
crowded place she has an anxiety attack and becomes "shaky and sweating" and
"panicky" to the point of needing to either sit down or leave.   Id. at p. 54.   She
sees Dr. Lord for her anxiety, stress and panic attacks.   Id. at p. 55.   Because of
her pain and mental condition, Ms. Stickler only leaves her mother's residence
three or four times a week, an hour or so at a time.   Id. at p. 57.   She then
returns home and goes to bed.   Id.

    Concerning her ability to maintain a pace of activities, Ms. Stickler testified
she must "take it easy and slow" and sometimes tasks have to be done in steps or
not get finished.   Id. at p. 58.   Concerning housekeeping activities, Ms. Stickler
uses a "real light vacuum cleaner," and cannot move furniture or vacuum under
the beds.   Id. at p. 59.   While she testified to doing laundry, that activity
actually consisted of her putting clothes in the washer and then having her
mother move the wet clothing into the dryer.   Id.   Once dry, her mother
removes the laundry from the dryer and places it on the bed for Ms. Stickler to
fold.   Id. at pp. 59-60.   She no longer shops by herself because everything is too

heavy and she is unable to lift items.   <u>Id.</u> at p. 61.   She does not do any yard work.   <u>Id.</u>

In evaluating whether Ms. Stickler qualified for a listed impairment under Appendix 1, the ALJ selectively picked from Dr. Lord's 2012 clinical reports while ignoring his 2013 findings discussed above.   The ALJ chose to adopt Dr. Ertz's opinion (AR at pp. 398-402), Dr. Pelc's consulting psychologist's opinion (AR at pp. 425-43) and Ms. Stickler's 2011 (AR at p. 269-76) pre-surgical disability report without consideration of her 2012 report and 2013 testimony, Ms. Sharpe's testimony and Dr. Lord's 2013 findings.   Dr. Lord's treating records are not inconsistent with his 2013 opinion report and are consistent with Ms. Sharpe's testimony and Ms. Stickler's description of her debilitating deterioration in the fall of 2012 and into the spring of 2013.

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." <u>House v. Astrue</u>, 500 F.3d 741, 744 (8th Cir. 2007) (citation and internal quotation marks omitted).   However, "while entitled to special weight, it does not automatically control, particularly if the treating physician evidence is itself inconsistent."   <u>Id.</u> (citations and internal quotation marks omitted).   If the treating physician's opinion is not given controlling weight under 20 CFR §§ 404.1527(d)(2), it must be weighed considering the factors in 20 CFR §§ 404.1527(d)(2)-(6).   <u>See</u> <u>Shontos v. Barnhart</u>, 328 F.3d 418, 426 (8th Cir.

2003) ("Where controlling weight is not given to a treating source's opinion, it is weighed according to the factors enumerated . . . ."). The ALJ must "give good reasons for discounting a treating physician's opinion." Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2002). The court must "defer to an ALJ's credibility finding[s] as long as the ALJ . . . gives a good reason [for those findings]." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (internal citation and quotation marks omitted).

"The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). In this case, the reviews conducted by the consulting physicians are not supported by the objective medical evidence. The consulting psychologists did not have access to the entire record. While Dr. Pelc had access to most of the record when he testified at the administrative hearing, he left the hearing before Ms. Stickler testified.[13] (AR at p. 41). Dr. Pelc's testimony also did not consider Ms. Sharpe's post-hearing affidavit. Ms. Stickler's testimony described a significant deterioration in her condition, was consistent with Dr. Lord's clinical records and his opinion report, and the post-hearing testimony of Ms. Sharpe. Not having access to this critical portion of the administrative record, Dr. Pelc's report is not entitled to any weight. McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011).

_____

[13]Neither Dr. Pelc nor the other consultants for the Social Security Administration suggested a lack of intensive counseling or hospitalizations were indicative of the intensity of Ms. Stickler's two mental impairments, depression and anxiety.

27

The ALJ erred, both factually and as a matter of law, when he chose to give substantial weight to the opinions of the consulting physicians.   The Commissioner's findings on this issue are not supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate, 457 F.3d at 869.   The ALJ's decision to reject the opinions of Dr. Lord is not supported by good reason and is not based on substantial evidence.   Guilliams, 393 F.3d at 801; Dolph, 308 F.3d at 878-79; and Schultz, 479 F.3d at 983.   Dr. Lord's opinions are entitled to controlling weight.   House, 500 F.3d at 744.

The ALJ did not complete a proper analysis at step three.   Remand to permit the ALJ to complete the step three analysis would normally be in order. But the court's step three discussion along with an analysis of steps four and five make remand unnecessary.

**STEP FOUR**

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity ("RFC"). 20 CFR § 404.1520(e).   RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any limitations from her impairments.   20 CFR § 404.1545(a)(1).   In making this finding, the ALJ must consider all of the claimant's impairments, including those which are not severe. 20 CFR § 404.1545(e).   All of the relevant medical and non-medical evidence in the record must be considered.   20 CFR §§ 404.1520(e) and 404.1545.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also Cox, 495 F.3d at 619 (because RFC is a medical question, the ALJ's decision must be supported by some medical evidence of a claimant's ability to function in the workplace, but the ALJ may consider non-medical evidence as well); Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence.").   The ALJ "still 'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.' "   Id. (quoting Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)).

"In determining RFC, the ALJ must consider the effects of the combination of both physical and mental impairments."   Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004) (citing Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)).   As stated earlier in this discussion, a severe impairment is one which significantly limits an individual's physical or mental ability to do basic work activities.   20 CFR § 404.1521(a).

As discussed above, the ALJ erred by failing to give Dr. Lord's opinions controlling weight and by failing to consider the testimony of Ms. Sharpe.   The remaining question is whether the ALJ properly discounted Ms. Stickler's credibility.   The ALJ found Ms. Stickler's "medically determinable impairments

could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."   (AR at p. 19).   The ALJ used the same 2011 disability report analyzed above to arrive at the credibility determination.

"[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."   Hogg v. Shalala, 45 F.3d 276, 278-79 (8th Cir. 1995) (citing Harris v. Secretary of DHHS, 959 F.2d 723, 726 (8th Cir. 1992) ("The fact that a claimant . . . cooks, cleans, shops, does laundry, and visits friends does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity.") and Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) ("a claimant need not prove she is bedridden or completely helpless to be found disabled. . . . The ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity.").

For the same reasons stated above in the step three analysis, the ALJ erred in limiting the determination of Ms. Stickler's credibility to consideration of only part of her testimony and without proper consideration of her mother's testimony and the opinions expressed by Dr. Lord.   Since high school, Ms. Stickler had a reputation for not allowing her educational disabilities to hold her back. (Docket 11 at p. 5 ¶ 9; AR at p. 549).   Once unable to work full-time at the

nursing home, the employer offered her a part-time certified nursing assistant position because they did not want to lose a valued employee.   (AR at p. 403). Finally, based on his years of clinical work with Ms. Stickler, Dr. Lord found she was not a malinger and worked in pain in an effort to maintain her independence.   (AR at p. 515).   Ms. Stickler's statements in 2012 and her testimony in 2013 should have been considered in light of this character evidence before her credibility was evaluated.

The court is to "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.' "   Schultz, 479 F.3d at 983 (quoting Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)).   The ALJ's decision to criticize Ms. Stickler's credibility ignores the overwhelming weight of the medical evidence, written submissions and testimony.   The evidence supporting Ms. Stickler's credibility "fairly detracts from [the Commissioner's] decision."   Reed, 399 F.3d at 920 (quoting Haley, 258 F.3d at 747); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994).   When examined in detail, the record supports rather than contradicts the testimony of Ms. Stickler.   Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Guilliams, 393 F.3d at 801-02.   The ALJ's conclusion to the contrary is not supported by the substantial weight of the evidence.   42 U.S.C. § 405(g); Choate, 457 F.3d at 869; Howard, 255 F.3d at 580.   The ALJ erred as a matter of law by discounting Ms. Stickler's credibility.   Smith, 982 F.2d at 311.

In this case, the ALJ rejected Dr. Lord's testimony about Ms. Stickler's psychological limitations and adopted the opinion of Dr. Pelc to arrive at RFC.

31

(AR at p. 23).   Because Dr. Lord's opinion is entitled to controlling weight, the ALJ's RFC, which did not incorporate Dr. Lord's opinions, is not supported by substantial evidence.

Dr. Lord opined that Ms. Stickler had "a limited ability to function outside her residence. . . . She cannot work an eight-hour-day, five days a week, or 50 weeks a year ever again . . . . Any part-time work would have to be tailored to her limitations, including her developmental issues, learning problems, reactivity issues, sleep difficulties, and chronic pain issues."   (AR at p. 515).   His projection of Ms. Stickler's functionality concluded with the following statement: "Darcie has chronic pain and severe physical impairment, as well as chronic depression and anxiety aggravated by her physical debilitation.   She would be absent from work, as a result of these impairments, for greater than four days per month."   Id. at p. 568.

Ms. Stickler satisfied the burden of persuasion to demonstrate her RFC. Stormo, 377 F.3d at 806.

**STEP FIVE**

The "burden of production shifts to the Commissioner at step five."   Id. William Tysdal, a vocational specialist, testified at the administrative hearing. (AR at pp. 66-69).   Mr. Tysdal concluded if the limitations reported by Dr. Lord and confirmed by Ms. Sharpe are applied, that is, Ms. Stickler was only able to "sit for 15 to 20 minutes at a time" and only "stand 15 to 20 minutes at a time," she could not perform any jobs.   Id. at pp. 68-69.

32

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing.   42 U.S.C. § 409(g).   If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate."   Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992).   Remand to the Commissioner is neither necessary nor appropriate in this case.   The Commissioner's own final witness resolves this case in favor of claimant.   Ms. Stickler is disabled and entitled to benefits.   Reversal is the appropriate remedy at this juncture.   Thompson, supra.

## ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion (Docket 12) is granted and the decision of the Commissioner of July 23, 2013, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff Darcie Jean Stickler.

Dated March 24, 2016.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE

33